**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| RALPH L. TAYLOR, III, Individually and | : | CIVIL ACTION |
| as Personal Representative of the Estates | : | |
| of Peter Sandek, Jo Ellen Sandek and | : | |
| Kyle Sandek, Deceased | : | |
| | : | |
| vs. | : | |
| | : | |
| MOONEY AIRCRAFT CORPORATION, | : | NO.  03-221 |
| et al. | : | |
| | : | |
| | : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                                          **APRIL 27, 2006**

         Peter, Jo Ellen, and Kyle Sandek died in a plane crash on November 26, 2000.  Presently

before me is Defendant Parker Hannifin Corporation's ("Parker Hannifin") Motion for Summary

Judgment on the claims filed by the estates of Jo Ellen and Kyle Sandek.  Parker Hannifin bases

its Motion for Summary Judgment on two general releases executed by Geoffrey Gish ("Gish"),

the former administrator of the Sandek estates.  Subsequently, Defendant Mooney Aircraft

Corporation ("Mooney") joined Parker Hannifin's Motion for Summary Judgment.  For the

following reasons, I shall deny Parker Hannifin's and Mooney's (collectively "Defendants")

Motion for Summary Judgment.

**I.        RELEVANT BACKGROUND**

         Peter Sandek, his wife Jo Ellen, and their son Kyle, lived in Georgia.  In March 2000,

Peter Sandek purchased an aircraft, a Mooney M20K, Registration No. N252MW, from GLM.

GLM is a limited liability corporation incorporated in Georgia and maintains its principal place

of business in Georgia.  GLM also maintained the aircraft in Georgia and had it serviced by a Georgia maintenance facility, WHP Aviation, Inc.  After purchasing the aircraft, Peter Sandek maintained it at WHP Aviation, Inc. and at another Georgia maintenance facility, Epps Air Service, Inc.  Parker Hannifin is an Ohio corporation and Mooney is a Texas Corporation.  None of the parties to this litigation are domiciled in Pennsylvania.

On November 22, 2000, the Sandeks took a Thanksgiving trip to New York to visit family.  Due to weather concerns, Peter Sandek landed his private airplane in Bradford, Pennsylvania, and completed the journey by driving to New York.  Upon landing, Mr. Sandek hangared his aircraft at the Bradford Airport for five days.  The Sandeks returned to the airport in Pennsylvania on November 26, 2000 to prepare for the flight home to Georgia.  At the Bradford Airport, Peter Sandek performed pre-flight checks, purchased aviation fuel, and paid his hangar rental fee.

Shortly after takeoff, Peter Sandek declared an emergency.  The Sandeks' estate claims that during the flight home, the aircraft's electrical, avionics, navigational systems, and flight control systems began to fail.  He crashed approximately 20 minutes later in Rixford, Pennsylvania, ten miles from the Bradford Airport.  Everyone aboard the plane was killed.

After the accident, Geoffrey Gish, a family friend, was named administrator of the Sandeks' estates.[1]  The Sandeks' estates are being administered in the State of Georgia, and are subject to the jurisdiction of a Georgia state court.  In his role as authorized administrator, and in exchange for the consideration of $50,000, Gish signed two "RELEASE[S] OF ALL CLAIMS" for the estates of Jo Ellen and Kyle Sandek.  The releases discharge:

---

[1]  The Sandeks' estates are currently being represented by Ralph L. Taylor ("Plaintiff"), a Georgia citizen.

>AC Transport Company, Inc., Peter Sandek, Estate of Peter Sandek, Avemco
>Insurance Company, and Universal Loss Management and . . . **all other persons,
>firms, corporations associations or partnerships of and from any and all
>claims, actions, causes of action, demands, rights, damages, costs, loss of
>service, expenses and compensation whatsoever**, which the undersigned now
>has/have or which may hereafter accrue on account of or in any way growing out
>of any and all known and unknown, foreseen and unforeseen bodily and personal
>injuries and property damage and the consequences thereof **resulting or to result
>from the accident, casualty or event which occurred on or about the 26th day
>of November, 2000 at or near Bradford, Pennsylvania**.

(Parker Hannifin's Summ. J. Mot. ("Parker Hannifin's Mot."), Ex. 9) (emphasis added).  The

releases further contained a merger clause that stated, "this Release contains the entire agreement

between the parties hereto."  (Id.).  The releases also instructed in bold, capital letters that Gish

should "READ BEFORE SIGNING BELOW" because he was representing that he "READ THE

FOREGOING RELEASE AND FULLY UNDERSTANDS IT."  (Id.).  The releases were

executed in Geogia.

At his deposition, Gish acknowledged that he complied with these directives by reading

and signing the releases on two separate days: February 7 and 12, 2001.  He reviewed each of the

broad provisions contained in the releases before signing them and knew about the releases'

expansive language.  Gish stated that he knew the releases were not limited to the insurance

company, but instead applied to "all other persons, firms, corporations, associations or

partnerships" and "any and all claims, actions, causes of action, demands, rights, damages, costs,

loss of service, expenses and compensation whatsoever."  (Parker Hannifin's Mot., Ex. 8 ).

Gish testified at his deposition that he sought and obtained the advice of Arizona attorney

John Goodson before signing the releases and that Goodson advised him to sign both releases.

Plaintiff, however, argues that Gish's testimony is untrue and that Gish never sought or received

the advice of Goodson in connection with the execution of the releases.

Pursuant to the terms of the releases, the Sandek estates were paid $50,000 by Avemco Insurance Company and Universal Loss Management, respectively.  This was the maximum amount available for liability to family members under the Avemco insurance policy covering Peter Sandek and AC Transport Company, the Nevada corporation that held title to the aircraft. Gish deposited the money into the estates' account for the benefit and use of the estate beneficiaries living in New York and Germany.

On February 24, 2006, Parker Hannifin filed its Motion for Summary Judgment based on the broad terms of the releases signed by Gish on behalf of the estates of Jo Ellen and Kyle Sandek.  Defendants argue that the releases discharge all claims filed against them by Jo Ellen and Kyle Sandek arising out of the November 26, 2000 plane crash.

II.     **STANDARD OF REVIEW**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Anderson, 477 U.S. at 249.  A factual dispute is material only if it might

4

affect the outcome of the suit under governing law.  Id. at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)(citing Celotex, 477 U.S. at 325 (1986)).  Further, the non-moving party has the burden of producing evidence to establish prima facie each element of its claim.  Celotex, 477 U.S. at 322-23.  If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper.  Id. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

## III.   DISCUSSION

I must decide whether the release clause that Gish signed on behalf of Jo Ellen and Kyle Sandek discharges Defendants.  Defendants argue that, under Pennsylvania law, the general release discharges them.  However, under Georgia law, the releases signed by Gish do not discharge Defendants.  As will be discussed below, pursuant to the choice of law rules of Pennsylvania, Georgia law must be applied here.  As such, the releases signed on behalf of the estates of Jo Ellen and Kyle Sandek do not discharge Defendants.[2]

---

[2] In addition to the choice of law issue, Plaintiffs make two additional arguments in the alternative that even applying Pennsylvania law Defendants' Motion for Summary Judgment must be denied.  First, Plaintiffs argue that the releases Gish signed were unconscionable. Second, Plaintiffs argue that by signing the releases without the benefit of legal counsel, Gish breached his fiduciary duty to the estates of Jo Ellen and Kyle Sandek.  Because Georgia law must be applied, Plaintiffs alternative arguments need not be addressed.

A.      **Choice of Law**

A federal court sitting in diversity applies the choice-of-law rules of its forum state.

Klaxon v. Stentor Elec. Mfg., 313 U.S. 487, 496 (1941); LeJeune v. Bliss-Salem, Inc., 85 F.3d

1069, 1071 (3d Cir. 1996).  Because choice-of-law analysis is issue specific, different states'

laws may apply to different issues in a single case, a principle known as 'depecage.'" Berg

Chilling Systems, Inc. v. Hull Corp., 435 F.3d 455, 463 (3d Cir. 2006).

Pennsylvania has developed a choice-of-law approach that combines the contacts analysis

of the Restatement Second with the governmental interest analysis.  Lacey v. Cessna Aircraft

Co., 932 F.2d 170, 187 (3d Cir. 1991)(describing Griffith v. United Air Lines, Inc., 203 A.2d 796

(Pa. 1964)).  Pennsylvania's approach to choice of law consists of two parts.  LeJeune, 85 F.3d at

1071.  First, the interests of the competing states must be compared to determine whether the

conflict between them is "true" or "false."  Id.  Second, if the conflict is "true," the interests of

the both states must be compared and the law of the state with more significant interest applied.

Id.

A false conflict arises when only one jurisdiction has an interest which would be impaired

by the application of another states laws and results in the application of the law of the impaired

state.  LeJeune, 85 F.3d at 1069.  A true conflict arises when both states have interests which

would be impaired by applying the law of the other state.  Austin v. Dionne, 909 F. Supp. 271,

274 (E.D. Pa. 1995).  With a true conflict, the state with greater interests prevails.  Id.  Here,

regardless of whether it is a false conflict or a true conflict, Georgia law applies to the release

clauses.

6

1.    <u>False Conflict</u>

The perceived conflict in this case is between how Georgia and Pennsylvania apply general release clauses to third parties who are not identified in the release by name and pay no consideration for the release.  Pennsylvania courts have held that general releases bar all claims arising out of a single tortious injury.  <u>See e.g.</u>, <u>Republic Ins. Co. v. Paul Davis Sys.</u>, 670 A.2d 614, 615 (Pa. 1995).  If a release extends to "any and all persons," the Pennsylvania Supreme Court has held that the signor intended to release unnamed parties, even those who paid no consideration for the release.  <u>Id.</u>  Georgia courts, however, have rejected Pennsylvania's common law interpretation of releases.  <u>Lackey v. McDowell</u>, 415 S.E.2d 902 (Ga. 1992).  Georgia law applies a bright-line test, where a third-party is not released unless specifically identified in the release by "either proper name or such other description as leaves no question of the identity of the party released."  <u>Id.</u> at 903 n.3.  Although the two states' laws seem to conflict, as will be explained below, the Pennsylvania Supreme Court and the United States Court of Appeals for the Third Circuit's cases hold that a false conflict exists when application of one law would advance that law's policies while nonapplication of the other law would not detract from that state's policies.  When an accident's occurrence within a state is purely fortuitous, that state's interests are not triggered and there is no reason to apply its law.  Applied here, a false conflict exists because the application of Georgia's interpretation of general releases would advance Georgia's policies while nonapplication of Pennsylvania's interpretation of general releases does not detract from Pennsylvania's policies because the Sandeks' accident occurred in Pennsylvania purely fortuitously.  A brief synopsis of these cases will illustrate this point more clearly.

7

Pennsylvania's leading case in this area is Griffith v. United Air Lines, Inc., 203 A.2d 796 (Pa. 1964).  In Griffith, "the Pennsylvania Supreme Court abandoned the traditional lex loci delicti conflicts rule under which the substantive rights of the parties had been governed by the law of the place of the wrong."  Lacey, 932 F.2d at 187.  At least one commentator has noted that Griffith presents a classic "false conflict."  See Eugene F. Scoles, et al., Conflict of Laws, 705 (3d ed. 2000) (noting that "mere discussion of potential interests does not necessarily mean that a court has weighed interests.  In fact, such discussion is necessary as a first step in order to find the potential 'false conflict.'").  In Griffith, the plaintiff's decedent was from Pennsylvania, boarded a plane to Phoenix, and was killed when the plane crashed in Colorado.  Due to a difference in how each state calculated damages, under Colorado law, the plaintiff would recover virtually nothing, while Pennsylvania law provided for recovery for the present value of the decedent's future earnings.  Abandoning the lex loci delicti rule, the Pennsylvania Supreme Court focused instead on effectuating governmental interests.  Griffith, 203 A.2d at 805.  "The polices of Colorado which underlie that state's limited recovery statute – prevention of speculative computation of expected earnings, protection of Colorado defendants from large verdicts – are discussed but aptly discounted because the burden on a Pennsylvania forum is of no concern to Colorado and the defendant was not a Colorado corporation."  Scoles, et al., Conflicts of Laws, at 705 (citing Griffith, 203 A.2d at 807).  Colorado, therefore, had no continuing concern with the litigation other than a few witnesses from Colorado who would be called in Pennsylvania.  Pennsylvania, on the other hand, was concerned for the decedent's estate and the well-being of the local survivors.  Griffith, 203 A.2d at 807.  Griffith presents a false conflict because an analysis of the policies underlying the "conflicting" laws revealed that

8

Colorado, in fact, lacked an interest while "Pennsylvania's interest . . . [was] great." Id.

The Third Circuit tackled the "false conflict" question in 1980 when it decided <u>Reyno v. Piper Aircraft Co.</u>, 630 F.2d 149 (3d Cir. 1980).  <u>Piper</u> involved the personal representatives of several Scottish citizens who were killed in a plane crash in Scotland and brought suit against two American manufacturers.  The Third Circuit decided whether to apply Pennsylvania's strict liability law or Scotland's negligence law by inferring from basic tort law the general policies that underlie these competing standards of care.  First, the Court hypothesized that in order to encourage industry within its borders, Scotland chose a negligence standard instead of a strict liability standard.  Next, the Third Circuit opined that by adopting a strict liability standard, Pennsylvania was attempting to shift some of the burden of injuries from consumers onto producers and to induce manufacturers to be more careful.  Based on these competing interests, the Third Circuit concluded that there was a false conflict:

> Applying Pennsylvania's strict liability standard to its resident manufacturing would serve that state's interest in the regulation of manufacturing.  Scotland's interest in encouraging industry within its borders would not be impaired, however, by applying a stricter standard of care on a foreign corporation which has no industrial operation in Scotland.  Furthermore, Scotland would have no interest in <u>denying</u> compensation to its residents for the purpose of benefitting a foreign corporation.  Finally, imposition of strict liability on Piper cannot be said to be unfair to it.  Inasmuch as Pennsylvania, the state in which Piper makes its product, and the vast majority of American jurisdictions in which most of Piper's aircraft are sold and fly, have strict liability, that is the legal standard under which it plans its operations.

630 F.2d at 168 (emphasis in original) (footnote omitted).  The Third Circuit found that Pennsylvania law should apply because Pennsylvania's interest could be served without interfering with any significant interest of Scotland.

Adopting the reasoning of <u>Piper</u>, the Third Circuit again held that there was a false

conflict in <u>Lacey v. Cessna Aircraft Co.</u>, 932 F.2d 170, 188 (3d Cir. 1991).  Once again involving

a plane crash, the conflict in <u>Lacey</u> appeared to result from the fact that Pennsylvania adopted

strict liability, while British Columbia did not.  This apparent conflict was found to be a false

conflict because:

> Applying Pennsylvania law of strict liability would further Pennsylvania's interest
> in deterring the manufacture of defective products and in shifting the costs of
> injuries onto producers, but would not impair British Columbia's interest in
> fostering industry within its borders.  Conversely, applying British Columbia's
> negligence standard would not serve British Columbia's interest, but would harm
> Pennsylvania's interest.

<u>Lacey</u>, 932 F.2d at 188.

More recently, the Third Circuit found a false conflict between § 388(1) of New York's

Vehicle and Traffic Law and Pennsylvania common law in <u>Garcia v. Plaza Oldsmobile Ltd.</u>, 421

F.3d 216, 223 (3d Cir. 2005).  Defendant Gladney rented a car from Plaza Oldsmobile ("Plaza")

in Brooklyn, New York, on February 25, 2002, drove it to Pennsylvania and got into an accident

with Plaintiff Garcia the very same day.  As a result of a car accident, the issue of whether Plaza

could be liable to Garcia arose.  Under Pennsylvania common law, Plaza could not be liable to

Garcia.  However, under New York law, Plaza would be liable to him because New York

imposes vicarious liability on a vehicle owner, here Plaza, for injuries arising from the

negligence of anyone using or operating its vehicle with permission.  Deciding that there was a

false conflict between the New York and Pennsylvania laws, the Third Circuit first looked to

whether New York's Vehicle and Traffic Law had extraterritorial application.  <u>Garcia</u> 421 F.3d at

220-21.  Finding that the New York law had extraterritorial application based on the language of

the New York law and New York courts interpretation of its law, the Third Circuit examined the

competing state interests in having their respective laws applied.  Id. at 221-223.  After balancing

these interests, the Third Circuit found that there was a false conflict because "applying New

York Law to impose liability on Plaza does not impair the interests of Pennsylvania, while . . .

the application of Pennsylvania law would impair New York's interest in providing injured

plaintiffs with a financially responsible defendant, and imposing a high degree of responsibility

on the owners of the vehicles."  Id. at 223.

Applying the analytical framework of these cases to the present case, it appears that there

is a false conflict between the Pennsylvania and Georgia interpretations of general release

clauses.   Georgia has an interest in applying its general release law and that interest would be

impaired by the application of Georgia law.  Pennsylvania, however, does not have an interest in

applying its general release law because of the purely fortuitous nature of the plane crash's

location in Pennsylvania.  An analysis of both states' interests in Sandeks' plane crash follows.

a. <u>Georgia</u>

In <u>Posey v. Medical Center-West, Inc.</u>, 354 S.E.2d 417 (Ga. 1987), the Georgia Supreme

Court considered whether to follow the long standing rule that a general release given to one

tortfeasor releases all joint tortfeasors.  In rejecting this rule, the court held that:

> [a] valid release of one tortfeasor from liability for a harm, given by the injured
> person, does not discharge others for the same harm, unless it is agreed that it will
> discharge them . . . [and] that the intent of the parties to the release regarding its
> effect may be proven by external evidence as against a third party.

Id. at 59 (citation omitted).  Subsequently, the Georgia Supreme Court modified the <u>Posey</u> rule

by eliminating the need to inquire into the intent of the parties to the release.  <u>Lackey</u>, 415 S.E.2d

at 903.  The court held that "only those parties named in the release will be discharged by that

instrument." <u>Id.</u>  To be released, a party must be "identified either by proper name or such other description as leaves no question of the identity of the party released." <u>Id.</u> at 903 n.3.  This rule applies to contracts entered into by non-Georgia parties as long as the contract was completed in Georgia.  <u>Davis v. Brunswick Corp.</u>, 854 F. Supp. 1574, 1576-78 (N.D. Ga. 1993).  The Georgia Supreme Court is clear that a release should be construed under the law of the state where the release was executed.  <u>Menendez v. Perishable Distributors, Inc.</u>, 329 S.E.2d 149 (Ga. 1985).

By taking this approach to releases, Georgia has expressed an interest in protecting its residents from losing claims against other parties when they settle with one party as a result of an overly broad release.  Specifically, the Georgia Supreme Court set forth Georgia's interest in protecting its residents from the harsh effects of the old common law rule of general releases whereby a "release" and "satisfaction" were treated as identical.  <u>Posey</u>, 354 S.E.2d at 418-19. The Georgia Supreme Court held that a "release" is not equivalent to a satisfaction, and therefore, it is unfair to deprive its claim-holding residents of their entitlement to full "satisfaction" by applying the common law rule of releases.  <u>Id.</u> at 419 (holding with regard to the common law rule of general releases that "[t]here is no rational basis for such a rule. . . . Certainly, C ought to be allowed to release A without releasing B if that is his intention, at least until he has full satisfaction.").  The New Mexico Supreme Court has articulated a state's interest in avoiding ambiguity that frequently results when release agreements are signed:

> release agreements are most often drafted by the party seeking to be released, the attorneys who draft these agreements and the insurance companies they represent are laboring under the influence of a bygone era, and the victim's interest in obtaining recompense frequently overshadows concerns with boilerplate language that is often introduced for the first time in a release prepared after the specific parties have agreed to settle.

Hansen v. Ford Motor Co., 900 P.2d 952, 960 (N.M. 1995).  Other courts suggest that a rule

requiring specific identity of parties to be released provides the best method for ascertaining the

parties' actual intent because it eliminates ambiguity and precludes the unintended release of

strangers to the contract.  See, e.g., Moore v. Missouri Pacific R.R., 773 S.W.2d 78, 80-81 (Ark.

1989); Bjork v. Chrysler Corp., 702 P.2d 146, 162-63 (Wyo. 1985).

        Here, Georgia law can be applied to the facts presented here and Georgia's interests

would be impaired by the application of Pennsylvania's interpretation of general releases.  The

releases were executed by Gish, a Georgia resident, in Georgia.  They were executed on behalf of

the estates of Georgia residents Jo Ellen Sandek and Kyle Sandek.  In exchange for $50,000, the

releases discharged "AC Transport Company, Inc., Peter Sandek, the Estate of Peter Sandek,

Avemco Insurance Company, and Universal Loss Management."  (Parker Hannifin's Mot. Ex. 9).

However, the release also contained a general clause that Parker Hannifin and Mooney Aircraft

have attempted to utilize.  The general clause appears to discharge "all other persons, firms,

corporations, associations or partnerships."  (Id.).  Under Georgia law, Parker Hannifin and

Mooney Aircraft would not be released by this clause because they were not "identified by either

by proper name or such other description as leaves no question of the identity of the party

released."  Lackey, 415 S.E.2d  at 903, n.3.  I recognize, therefore, that as a matter of Georgia

law, Georgia's interpretation of general releases applies to this case and Georgia has an interest

in applying its law to releases signed by Gish.

        Georgia's interest in protecting persons who sign broad general releases from losing legal

claims would be impaired by the application of Pennsylvania's common law rule that a general

release is unambiguous and therefore discharges all potential joint tortfeasors, both named and

13

2e79479c4338a33d

unnamed.  See Republic Insurance Co. v. Paul Davis Systems of Pittsburgh South, Inc., 670 A.2d

614, 615-16 (Pa. 1995); Buttermore v. Aliquippa Hosp., 561 A.2d 733, 735 (Pa. 1989).  In this

case, while Georgia's law would not discharge Parker Hannifin and Mooney Aircraft,

Pennsylvania's common law rule would appear to free Parker Hannifin and Mooney from

liability.  Georgia's interest in having its law applied to releases executed within its borders, by

its residents, would be undermined by the application of Pennsylvania common law that would

discharge defendants who were not specifically mentioned in the general releases.

b.  Pennsylvania

Pennsylvania's interest in this litigation is more difficult to define.  Defendants must first

establish that Pennsylvania has an interest in applying its law before I may consider whether

Pennsylvania's interests would be impaired by the application of Georgia law.  Although it is a

close issue, I find that Pennsylvania has no interest in the application of its law to the Sandeks'

general releases because the accident's occurrence in Pennsylvania was fortuitous.[3]  None of the

parties in this action are Pennsylvania residents.  Parker Hannifin is an Ohio corporation and

Mooney Aircraft is a Texas Corporation.  The Sandeks were Georgia residents.  Their Georgia

estates are currently being represented by Ralph L. Taylor, a Georgia citizen.  The Sandeks'

general releases were signed in Georgia, by a Georgia personal representative, Gish.  In short,

_____

[3]  If, alternatively, Pennsylvania had an interest in having its general release law apply, then there would
certainly be a true conflict because the application of Georgia's law would impair Pennsylvania's interests.  Once
again, Pennsylvania courts have held that general releases bar all claims arising out of a single tortious injury
regardless of whether those seeking to enforce the general release paid consideration for such a discharge.  Republic
Ins. Co., 670 A.2d at 615.  The policy interest supporting Pennsylvania's approach was described in Buttermore, 561
A.2d at 735, as protecting the party's intent at the time the release is signed.  The parties' intent is determined by the
agreement, or release, they sign and cannot be changed if subsequently found to be unwise or improvident.  Id.
Defendants point to the oft-quoted justification for this rule that, "[i]t would make a mockery of the English language
and of the law to permit this release to be circumvented or held to be nugatory."  Id. (quoting Emery v. Mackiewicz,
240 A.2d 68, 70 (Pa. 1968).  This interpretation clearly conflicts with Georgia's lenient interpretation of general
releases.

Pennsylvania has no interest in applying its general release law when an airplane fortuitously crashes in Pennsylvania if the releases are later executed in Georgia and only apply to non-Pennsylvania entities.

However, Defendants disagree that the crash in Pennsylvania was fortuitous and argue that the Sandeks' crash was nonfortuitous thereby establishing an interest for Pennsylvania to apply its law on general releases.  The Sandeks' nonfortuitous crash in Pennsylvania, according to Defendants, triggers Pennsylvania's interest in applying its general release law because Defendants regularly conduct business in Pennsylvania[4] and Pennsylvania's release law encourages their business.  It follows that the fact that Defendants regularly conduct business in Pennsylvania only triggers Pennsylvania's interest in applying its general release law if the Sandek's crash occurred in Pennsylvania nonfortuitously.

In a choice-of-law analysis, the difference between fortuitous and nonfortuitous is crucial.  "The choice of law is a false conflict where the site of the accident is purely fortuitous because . . . the state in which the accident occurred has no interest in applying its law to the parties' conflict."  Kuchinic v. McCrory, 222 A.2d 897, 899 (Pa. 1966).  Conversely, there is a true conflict where the site of the accident is nonfortuitous because Pennsylvania "has an interest in

---

[4]  In addition to arguing that Pennsylvania has an interest in applying its general release law because of the Defendants regular business conducts within Pennsylvania, Defendants argue that Pennsylvania has an interest in applying its general release law to lawsuits brought before courts in Pennsylvania.  (Parker Hannifin's Reply at 2).  However, the mere fact that this case is before a court sitting in Pennsylvania does not support the application of Pennsylvania law.  The central underlying assumption of the choice-of-laws doctrine is that a federal court presiding over a diversity matter must, when it is appropriate, apply the law of a foreign jurisdiction.  See generally, Klaxon, 313 U.S. at 487.  Defendants must demonstrate that Pennsylvania's interest in applying its release interpretation is impaired by relying on something other than this Court's forum.

Defendants also argue that Pennsylvania's interest in encouraging and enforcing settlements is damaged by applying Georgia's release law here.  However, Defendants' argument is inapplicable to the present case where no settlement was agreed to by the parties at bar.  Furthermore, applying Georgia's interpretation of releases in no way impedes the ability of the present parties to settle this case.

prescribing the rules governing torts occurring nonfortuitously within its borders."  LeJeune, 85

F.3d at1071.  A true conflict exists because a "state's interest in enforcing its tort law is not

constrained to protecting residents from harm or suit," but extends to limiting liability through its

interpretation of releases in an effort to encourage economic activity in the state and lowering

costs to consumers.  Id. at 1072.

Although it is an extremely close question, viewing the facts in a light most favorable to

the Plaintiff, I find that the fact that the Sandeks' accident occurred in Pennsylvania was purely

fortuitous.  The site of an accident is purely fortuitous only where "'the relevant state has no

interest in or relationship to the parties or the accident except that the accident occurred within its

borders.'"  Foca v. Sears Roebuck Co., No. 88-8908, 1990 U.S. Dist. LEXIS 7341, *8 (E.D. Pa.

June 15, 1990) (quoting Kiehn v. Elken Spigerverket A/S Kemi-Metal, 585 F. Supp. 413, 415 n.1

(M.D. Pa. 1984), vacated, 628 F. Supp. 976 (M.D. Pa. 1986)).  As a general rule, when a party is

injured in an airplane crash, the site of the accident is considered purely fortuitous.  Griffith, 203

A.2d at 806; Kuchinic, 222 A.2d at 900.   In comparison, "if a party intentionally and voluntarily

enters a state, the fact that an accident occurs there is not purely fortuitous."  Williams v. Terex-

Telelect, Inc., No. 01-3770, 2003 U.S. Dist. LEXIS 9733, *4 (E.D. Pa. May 19, 2003); see also

LeJeune, 85 F.3d at 1071.  The facts presented here do not fit neatly into either category.

Although this case involves an airplane crash, Defendants argue that Peter Sandek

intentionally and voluntarily entered Pennsylvania.  Due to bad weather, Peter Sandek decided to

land his plane at the Bradford Pennsylvania Airport, and drive to their destination in New York.

Defendants state that the Sandeks employed the resources of the Pennsylvania airport and its

personnel.  Mr. Sandek linked to and utilized the Bradford Airport's glide slope and localizer in

landing his aircraft.  He also requested progressive taxiing instructions from Bradford Airport personnel.  The Sandeks then hangared their airplane for five days in Pennsylvania and purchased fuel in preparation for their flight home.  They took off from the Bradford airport to return home to Georgia and, unfortunately, crashed shortly after take-off.  The short flight never left Pennsylvania's airspace.  Defendants argue that these facts dispositively show that Peter Sandek intentionally and voluntarily entered Pennsylvania and, therefore, the Pennsylvania crash location was not purely fortuitous.

On the other hand, viewing the facts in a light most favorable to the Plaintiff, it appears that the accident occurred in Pennsylvania quite fortuitously.  The Sandeks were on their way from Georgia to New York for Thanksgiving.  They had no intention of landing in Pennsylvania and only did so involuntarily after bad weather forced them to.  The accident itself took place after the aircraft took flight while the Sandeks were attempting to return home to Georgia, after their stay in New York.

Furthermore, the facts presented here comport more with the purely fortuitous nature of airplane accidents as described by Griffith, 203 A.2d at 806, and Kuchinic, 222 A.2d at 900, than the intentional and voluntary business activities described in LeJeune, 85 F.3d at 1071, and Williams, 2003 U.S. Dist. LEXIS, at *4.  In both LeJeune and Williams, a Pennsylvania resident was injured at their workplaces in different states which they routinely and repeatedly went to. Here, but for bad weather, the Sandeks never would have entered Pennsylvania and only stayed briefly.  Moreover, this case can be distinguished from LeJeune.  In LeJeune, a Pennsylvania resident was injured in Delaware.  The Third Circuit concluded that Delaware was not a fortuitous place of injury because the state was the fixed location of the plaintiff's workplace,

plaintiff regularly had a presence there, and a majority of the wrongful conduct occurred in Delaware. LeJeune, 85 F.3d at 1071.   Here, Plaintiff alleges that the offending conduct occurred entirely outside of Pennsylvania, the Sandeks had no intention of ever going to Pennsylvania, and airplane travel is inherently transitory compared to the fixed nature of a physical work place such as a factory.

In short, the choice-of-law analysis presents a false conflict because the site of the accident was purely fortuitous and Pennsylvania has no interest in applying its law to the parties' conflict.  Applying Georgia's interpretation of general releases does not impair the interests of Pennsylvania, while on the contrary, dismissing Defendants pursuant to the release signed by Gish on behalf of the Sandeks' Estates would impair Georgia's interest of ensuring that releases executed by its residents, within its borders, are interpreted according to Georgia law.  See Lacey, 932 F.2d at 187.  Therefore, this case presents a false conflict, and I must apply the law of the only interested jurisdiction, Georgia.  However, due to the admittedly close nature of the false conflict question, it is imperative that this case be analyzed as if it presented a true conflict as well.

2.    True Conflict

Assuming arguendo that a true conflict exists, upon balancing the interests, I find that Georgia law must be applied here.  When there is a true conflict of laws, Pennsylvania courts apply the law of the state with the most significant relationship to, and interest in, the matter. See Klaxon, 313 U.S. at 496; LeJeune, 85 F.3d at 1070.  To determine a state's interest in the matter, Pennsylvania follows a "flexible rule," that "permits analysis of the policies and interests underlying the particular issue before the court." Griffith, 203 A.2d at 796.  The Third Circuit

18

interprets Griffith to mean that a court applying "Pennsylvania law should use the Second
Restatment of Conflict of Laws as a starting point, and then flesh out the issue using an interest
analysis." Berg Chilling Systems, Inc. v. Hull Corp., 435 F.3d 455, 463 (3d Cir. 2006).

"The Second Restatement dictates different approaches depending on the substantive law
at issue." Id. Thus, I must first characterize the particular issue before me as one of tort,
contract, or some hybrid, in order to apply the appropriate Restatement section for guidance. Id.
Here, the substantive law at issue, the interpretation of a general release, is governed by tort law.[5]
General releases are governed by Restatement (Second) of Conflicts of Laws § 170.  Section 170
states that, "[t]he law selected by application of the rule of § 145 [governing tort claims]
determines the effect of a release or covenant not to sue given to one joint tortfeasor upon the
liability of the others."  Restatement (Second) Conflicts of Law § 170(1).  Section 145 provides:

> (1) The rights and liabilities of the parties with respect to an issue in tort are
> determined by the local law of the state which, with respect to that issue, has the
> most significant relationship to the occurrence and the parties under the principles
> stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine
> the law applicable to an issue include:
>
> > (a) the place where the injury occurred,
> > (b) the place where the conduct causing the injury occurred,
> > (c) the domicile, residence, nationality, place of incorporation and place of
> > business of the parties, and
> > (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with

---

[5] Although not addressed by the parties, an argument can be made that the Sandeks' release raises issues of
contract law in addition to tort law.  Analysis of these factors also weighs in favor of applying Georgia's
interpretation of general releases.  Relevant contacts in a contract case include: "(a) the place of the contracting, (b)
the place of negotiation of the contract, (c) the place of the performance, (d) the location of the subject matter of the
contract, (e) the domicile, residence, nationality, place of incorporation and place of business of the parties."
Compaigne des Bauxites v. Argonaut-Midwest Ins. Co., 880 F.2d 685, 689 (3d Cir. 1989).

respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145; see also Blakesley v. Wolford, 789 F.2d 236,

239 (3d Cir. 1986).  The comments to § 170 provide more explanation on how to weigh the

appropriate contacts.  Comment "c. Rationale" explains that the local law of the state of the

injury will "be applied unless some other state has a greater interest in the determination of the

particular issue."  Restatement (Second) Conflicts of Laws § 170, cmt.c; see also Shields v.

Consol. Rail Corp., 810 F.2d 397, 399 (3d Cir. 1987).  Comment "c." goes onto say that "[i]f all

of the interest[ed] parties are domiciled in the state where the instrument was executed, it would

seem that, usually at least, this state would have the greatest interest in the issues dealt with in

this Section and that its local law should be applied."  Id.  Finally, § 170 offers an illustration that

is relevant to the current case:

> In state X, A is injured by B.  He enters a hospital in state Y and there is operated
> on by C in an attempt to alleviate the effect of the injury done him by B.
> Thereafter in [state] Y, A settles his claim against B and gives him a release.  A
> now brings suit against C claiming that he suffered additional injuries because of
> C's negligence.  Under [state] X local law, the release given B would discharge C.
> This would not be so under the local law of [state] Y.  On the facts stated, [state]
> Y is the state of most significant relationship with respect to the issue of whether
> C was discharged by the release A gave B.  Accordingly, A's rights against C
> were not discharged by the release given B.

Id., at Illustration 1.

Assuming arguendo that the accident nonfortuitously occurred in Pennsylvania, the site of

the accident is outweighed by Georgia's interests in, and relationship to, the events and the

parties at bar.  The contacts listed in § 145 are instructive to determine which state, Pennsylvania

or Georgia, has more interest in applying their general release law.  First, the parties agree that

the accident took place in Pennsylvania.  Furthermore, in order to establish a true conflict, I must

assume that the accident's occurrence in Pennsylvania was not entirely fortuitous. Therefore, the first factor weighs heavily in favor of applying Pennsylvania law to the releases signed by the Sandeks Estate.

Second, Georgia has a greater relationship to the injury producing conduct than Pennsylvania. Although none of the alleged design or manufacturing defects occurred in Pennsylvania or Georgia, the Sandeks' aircraft containing the vacuum pump manufactured by Parker Hannifin was purchased, based, and maintained in Georgia. Furthermore, Plaintiff argues that one of Defendants' likely defenses will be that Georgia residents, WHP Aviation, Inc., and Epps Air Service, Inc., are liable for negligently maintaining the aircraft in Georgia, thereby causing the accident. In <u>Taylor v. Epps Air Service Inc., et al.</u>, No. 02-A-99642-5 (Dekalb Co., Ga. St. Ct.), Plaintiff alleges that WHP Aviation, Inc., and Epps Air Service, Inc., performed negligent maintenance on the Sandeks' plane on at least four and three separate occasions, respectively.

Third, the domiciles of the parties weighs strongly in favor of applying Georgia law. None of the parties resided or were incorporated in Pennsylvania. Defendants reside in Ohio and Texas. The Sandeks' were Georgia residents. The Sandek Estates are domiciled in Georgia. The personal representative of the Sandek Estates is a Georgia attorney who lives and works in Georgia. Georgia has a compelling interest in ensuring that releases executed by its residents, within its borders, are interpreted according to Georgia law. <u>See</u> <u>Dammarell v. Islamic Republic of Iran</u>, No. 01-2224, 2005 U.S. Dist. LEXIS 5343, at *67-68 (D.D.C. Mar. 29, 2005). "The claims of a decedent's estate are 'traditionally governed by the laws of the decedent's domicile,' because such an approach 'respects the decedent's deliberate choice to make his or her home in a

state and be governed by the laws of that state.'" Id. (quoting In re Air Crash Disaster Near Roselawn, Ind. on Oct. 31, 1994, 948 F. Supp 747, 758 (N.D. Ill. 1996); see also Datskow v. Teledyne Cont'l Motors Aircraft Prods., 807 F. Supp 941, 944 (W.D.N.Y. 1992) (holding that under New York law, the decedent's domicile should apply in wrongful death and survival action claims brought by decedents' estates, even though administratrix of one of the estates was resident of Pennsylvania); Doetsch v. Doetsch, 312 F.2d 323, 328 (7th Cir. 1963) ("The decedent's domicile is a traditional point of reference in the solution of many problems involving decedent's estates.").

Fourth and finally, the parties relationship is not centered and does not tip the balance heavily in favor of applying either Pennsylvania or Georgia law. On one hand, the accident occurred in Pennsylvania and the alleged product failures occurred in Pennsylvania, therefore, the Defendants were brought together by the Pennsylvania accident and the resulting Pennsylvania litigation. On the other hand, the alleged defective products were sold to the Sandeks in Georgia and maintained in Georgia. Finally, the conduct allegedly rendering the products defective occurred in neither Georgia or Pennsylvania, but in Ohio and Texas. The diverse nature of the parties' relationship, therefore, renders the fourth factor inapplicable to the present state interest analysis.

Looking at these contacts from both a quantitative and qualitative perspective, I conclude that Georgia law must prevail. Therefore, I shall apply Georgia law to the interpretation of the releases.

## IV.   CONCLUSION

Under Georgia law, only parties specifically named in a release are released from liability.

<u>Lackey</u>, 415 S.E.2d at 903.  Defendants Parker Hannifin and Mooney Aircraft are not named or otherwise identified in the releases.  Therefore, Defendants have not been released by the general releases Gish signed on behalf of the estates of Jo Ellen and Peter Sandek.  Defendants' Motion for Summary Judgement is based solely upon the application of Pennsylvania's interpretation of releases and, therefore, must be denied.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| RALPH L. TAYLOR, III, Individually and | : | CIVIL ACTION |
| as Personal Representative of the Estates | : | |
| of Peter Sandek, JoEllen Sandek and | : | |
| Kyle Sandek, Deceased | : | |
| | : | |
| vs. | : | |
| | : | |
| MOONEY AIRCRAFT CORPORATION, | : | NO.  03-221 |
| et al. | : | |
| | : | |
| | : | |

**O R D E R**

   **AND NOW** this    27th    day of April, 2006, upon consideration of the Motion for

Summary Judgment of Defendant Parker Hannifin Corporation, and joined by Defendant

Mooney Aircraft Corporation, and the responses thereto, it is **ORDERED** that Defendants'

Motion for Summary Judgment (Doc. No. 83) is **DENIED.**

                                                    BY THE COURT:


                                                     /s/ Robert F. Kelly
                                                    ROBERT F. KELLY,        Sr. J.